# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

SHAREY THOMAS, *et al.,*
Individually and on behalf of all others
similarly situated,

      *Plaintiffs*,

   v.                              Civil Action No. 3:21-cv-00498-DJN

MAXIMUS, INC.,

      *Defendant*.

_____/

## DEFENDANT MAXIMUS, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL COLLECTIVE CERTIFICATION

ADRIANA S. KOSOVYCH
  (admitted *pro hac vice*)
EPSTEIN, BECKER & GREEN, P.C.
875 Third Avenue
New York, New York 10022
Tel:  212-351-4500
Fax: 212-878-8600
AKosovych@ebglaw.com

PAUL DECAMP (VA Bar No. 76204)
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C.  20037
Tel:  202-861-0900
Fax: 202-296-2882
PDeCamp@ebglaw.com

AMARDEEP K. BHARJ
  (admitted *pro hac vice*)
EPSTEIN, BECKER & GREEN, P.C.
227 W. Monroe Street, Suite 3250
Chicago, IL 60606
Tel:  312 599-1400
Fax: 312-845-1998
ABharj@ebglaw.com

*Counsel for Defendant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND .................................................................. 3

I.    ALLEGATIONS IN THE COMPLAINT ......................................................................... 3

II.   THE EVIDENTIARY RECORD .................................................................................... 4

LEGAL STANDARD ............................................................................................................ 10

ARGUMENT ....................................................................................................................... 12

I.    PLAINTIFFS FAIL TO DEMONSTRATE THAT THEY ARE SIMILARLY SITUATED
      TO THE THOUSANDS OF MEMBERS OF THE PROPOSED COLLECTIVE ACROSS
      THE COUNTRY. ........................................................................................................ 12

      A.   Courts Routinely Deny Conditional Certification When Claims Require
           Individualized Analyses Of Important Issues. ................................................ 12

      B.   The Record Demonstrates That Individualized Circumstances Preclude A
           Finding That The Proposed Collective Is Similarly Situated. .......................... 13

      C.   The Need For Extensive Individualized Inquiries Renders Any Collective
           Action Unmanageable .................................................................................... 19

      D.   Individualized Defenses To Liability Preclude Class-Wide Resolution. ......... 24

II.   IN THE ALTERNATIVE, THE COURT SHOULD DIRECT THE PARTIES TO ENGAGE
      IN DISCOVERY FOCUSED ON WHETHER THE PROPOSED OPT-IN CLASS IS
      SIMILARLY SITUATED. ............................................................................................ 26

III.  PLAINTIFFS' PROPOSED FORM AND MANNER OF NOTICE ARE IN MANY KEY
      RESPECTS INAPPROPRIATE ...................................................................................... 27

      A.   Plaintiffs' Proposed Notice Contains Inaccurate, Misleading, And Biased
           Statements And Should Be Modified. ............................................................ 27

      B.   Plaintiffs' Proposed Manner Of Distribution And Schedule Is Excessive
           And Should Be Modified. ................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anyere v. Wells Fargo, Co., Inc.*,
  No. 09 Civ. 2769, 2010 WL 1542180 (N.D. Ill. Apr. 12, 2010) ...........................................29

*Basco v. Wal–Mart Stores, Inc.*,
  No. 00 Civ.A. 3184, 2004 WL 149770 (E.D. La. July 2, 2004)............................................13

*Brechler v. Qwest Commc'ns Int'l, Inc.*,
  No. 06 Civ. 00940 (PHX) (ROS), 2009 WL 692329 (D. Ariz. Mar. 17, 2009) ....................13

*Byard v. Verizon W. Va., Inc.*,
  287 F.R.D. 365 (N.D. W. Va. Oct. 24, 2012) ..................................................................27, 29

*Calderon v. GEICO Gen. Ins. Co.*,
  No. 10 Civ. 1958 (RWT), 2011 WL 98197 (D. Md. Jan. 12, 2011)......................................29

*Camper v. Home Quality Management Inc.*,
  200 F.R.D. 516 (D. Md. 2000)..............................................................................................19

*Choimbol v. Fairfield Resorts, Inc.*,
  475 F. Supp. 2d 557 (E.D. Va. 2006) ...................................................................................12

*D'Anna v. M/A–COM, Inc.*,
  903 F. Supp. 889 (D. Md. 1995) ......................................................................................12, 19

*England v. New Century Fin. Corp.*,
  370 F. Supp. 2d 504 (M.D. La. 2005)...................................................................................12

*Faust v. Comcast Cable Commc'ns Mgmt., LLC*,
  Nos. 10 Civ. 2336 (WMN), 12 Civ. 2909 (WMN), 2014 WL 3534008 (D. Md.
  July 15, 2014)...................................................................................................................24, 26

*Green v. Planters Nut & Chocolate Co.*,
  177 F.2d 187 (4th Cir. 1949) ...............................................................................................24

*Hawkins v. E. I. du Pont De Nemours & Co.*,
  192 F.2d 294 (4th Cir. 1951) ...............................................................................................25

*Hinterberger v. Catholic Health Sys.*,
  No. No. 08 Civ. 380S, 2009 WL 3464134 (W.D.N.Y. Oct. 21, 2009)....................................29

*Hipp v. Liberty Nat'l Life Ins. Co.*,
  252 F.3d 1208 (11th Cir. 2001) ................................................................20

*Johnson v. TGF Precision Haircutters, Inc.*,
  No. 03 Civ.A. H 3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) ...................................13

*Lindow v. United States*,
  738 F.2d 1057 (9th Cir. 1984) ................................................................25

*Lineras v. Inspiration Plumbing LLC*,
  No. 10 Civ. 324, (JCC), 2010 WL 4623940 (E.D. Va. Nov. 3, 2011)...................................28

*Martinez v. Cargill Meat Solutions*,
  265 F.R.D. 490 (D. Neb. 2009)................................................................29

*Meadows v. NCR Corp.*,
  No. 16 Civ. 6221, 2020 WL 1042042 (E.D. Ill. Mar. 4, 2020) .................................23, 24, 25

*Myers v. Baltimore County*,
  50 F. App'x. 583, 2002 WL 31236296 (4th Cir. 2002) ............................................24

*Purdham v. Fairfax Cty. Pub. Sch.*,
  629 F. Supp. 2d 544 (E.D. Va. 2009) .......................................................12, 19, 20

*Reab v. Elec. Arts, Inc.*,
  214 F.R.D. 623 (D. Colo. 2002) ................................................................29

*Steinberg v. TQ Logistics, Inc.*,
  No. 10 Civ. 2507 (JFA), 2011 WL 1335191 (D.S.C. Apr. 7, 2011).......................................29

*Swales v. KLLM Transport Services, LLC*,
  985 F.3d 430 (5th Cir. 2021) ...................................................... *passim*

*Syrja v. Westat, Inc.*,
  756 F. Supp. 2d 682 (D. Md. 2010)...........................................................19, 20

*Winks v. Dep't of Transp.*,
  No. 20 Civ. 420 (HEH), 2021 WL 2482680 (E.D. Va. June 17, 2021)...................................11

*Witteman v. Wisconsin Bell, Inc.*,
  No. 09 Civ. 440 (VIS), 2010 WL 446033 (W.D. Wis. Feb. 2, 2010)...................................29

**Statutes**

28 U.S.C. § 1292(b) ................................................................1, 11

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ................................................1

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs have asked this Court to certify a nationwide collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, regarding their federal claims for unpaid overtime wages.  Plaintiffs' Motion fails for each of the following reasons:

***First***, the only federal appellate court to directly address the applicable standard for certifying an FLSA collective action rejected the two-tiered approach that Plaintiffs advocate.  Instead, the Fifth Circuit in *Swales v. KLLM Transport Services, LLC*, 985 F.3d 430 (5th Cir. 2021), articulated a more rigorous standard requiring the Court to identify, at the outset of the case, whether merits questions are amenable to collective answers.  As explained in detail below, Plaintiffs fail to satisfy this standard because they provide no evidence to support the existence of a uniform policy or practice affecting the putative class that would permit the resolution of their claims on a collective basis.  The Court should follow the path charted by *Swales* and its progeny and deny the non-statutory "conditional" certification Plaintiffs seek.  Instead, the Court should focus first on identifying what facts and legal considerations will be material to determining whether a group of employees is similarly situated, and then authorizing preliminary discovery accordingly.  In the event the Court declines to follow *Swales*, the Court should certify the matter for an immediate appeal to the Fourth Circuit pursuant to 28 U.S.C. § 1292(b).

***Second***, although Plaintiffs allege in a conclusory manner the existence of an "unlawful company-wide policy that forces its Hourly Call-Center Employees . . . to perform unpaid off-the-clock work" and "without compensation," which Maximus purportedly applies "uniformly and consistently to all of its Hourly Call-Center Employees across the United States" (Pls.' Mem. Supp., ECF 29, at 1-2), they fail to provide any evidence of such a policy or practice.  Further,

1

Plaintiffs offer no explanation for how any of Maximus's actual practices might be unlawful. Regardless of the standard the Court elects to apply to Plaintiffs' motion, the record before this Court demonstrates no plausible basis for certifying—conditionally or otherwise—a collective action of Plaintiffs' claims under the FLSA.

*Third*, the processes and experiences Plaintiffs describe relative to logging in to their computers and programs at the start of their shift, going to and returning from meal breaks, troubleshooting technical issues, and logging off their computers at the end of their shift are antithetical to the processes and experiences described in testimony from 65 customer service representatives who have worked in call center locations where several of the named Plaintiffs have worked and in other Maximus call centers throughout the United States, defeating any purported similarity between Plaintiffs and the individuals they seek to represent. Indeed, in stark contrast to the 33 to 51 minutes per day Plaintiffs claim to have spent performing work related to booting up, logging in to programs, logout out of programs, and shutting down their computers before and after their shifts and during their meal breaks and/or perform troubleshooting of technical issues (Compl. at ¶¶ 56, 68, 69, 74, 84), many other customer service representatives have testified that:

- they were not required to turn their computers on or shut them down each day;

- the log in and log out process could take mere seconds, and nowhere near the "30 minutes or longer" that Plaintiffs allege;

- they remained on the clock and were paid whenever they experienced technical issues; and

- they took their full 30-minute meal breaks.

Plaintiffs' scattered anecdotes regarding their own alleged work experience are not at all representative of the putative collective they seek to represent.

Because Plaintiffs have wholly failed to meet their burden, their motion for conditional certification should be denied in whole or in part.  In the event the Court finds that conditional certification of a collective action is appropriate (which it should not), Maximus requests that the Court limit any conditional certification order to only those sites as to which Plaintiffs have presented evidence, and modify the proposed notice and consent and limit the manner of distribution of notice, as discussed below.  Alternatively, Maximus requests an opportunity to meet and confer with Plaintiffs to negotiate mutually agreeable terms for the form and manner of notice.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    ALLEGATIONS IN THE COMPLAINT

Maximus is a leading operator of government health and human services programs.  In connection with its operations, Maximus operates call centers throughout the United States, including in Florida, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Texas, and Virginia. (Compl. ¶ 36.)  Maximus customer service representatives ("CSRs") are primarily responsible for receiving inbound telephone calls from "consumers" and answering inquiries and offering assistance to consumers in connection with various government benefit programs. (Compl. ¶¶ 37, 38.)

Plaintiffs are current or former CSRs who have worked in one of the many Maximus call centers in various job positions.  Sharey Thomas worked in Lawrence, Kansas as a Customer Service Representative III ARC Medical from May 6, 2013 to May 18, 2020.  (Defs.' Answer to Am. Complaint, ECF 33, at ¶ 39.)  Brenda Fowler worked in Lynn Haven, Florida as a Customer Service Representative I Dual from November 4, 2019 to February 24, 2021.  (*Id.* at ¶ 40.)  Jennifer Gilvin has worked in Winchester, Kentucky as a Customer Service Representative II Market since August 26, 2019.  (*Id.* at ¶ 41.)  Laura Vick has worked in Bogalusa, Louisiana as a Call Center Supervisor from November 17, 2018 to February 16, 2019, as an Associate Specialist Customer

Service / Customer Service Representative I Dual from February 17, 2019 to October 31, 2020, and as a Call Center Supervisor since November 1, 2020. (*Id.* at ¶ 42.) Shannon Garner worked in Hattiesburg, Mississippi as a Customer Service Representative I Dual from July 29, 2019 to February 20, 2020. (*Id.* at ¶ 43.) Nyeshia Young worked in Kansas City, Missouri as an Admin 1 Administrative Services from June 24, 2019 to December 21, 2019 and then worked remotely in Missouri as a Customer Service Representative II from December 9, 2020 to June 17, 2021. (*Id.* at ¶ 44.) Jennifer Salcido worked in El Paso, Texas as a Survey Worker from January 21, 2020 to August 5, 2020. (*Id.* at ¶ 45.) Jimnelly Salcedo worked in Richmond, Virginia as a Customer Service Representative I Call Center from November 21, 2017 to October 25, 2019. (*Id.* at ¶ 46.)

## II.   THE EVIDENTIARY RECORD

Plaintiffs have submitted declarations from the named Plaintiffs and a scant handful of opt-ins containing recitations of their alleged experiences before and after their shift, during meal breaks, and when troubleshooting any technical issues. Although Plaintiffs' declarations feature strikingly similar—if not verbatim—assertions of an alleged "corporate-wide policy" that applied uniformly at all Maximus call centers nationwide, when contrasted with the voluminous evidence put forth by Maximus, they serve only to highlight the individualized and anecdotal nature of each individual customer service representative's work experience.

Maximus has submitted the declarations of 65 CSRs[1] who have worked in Maximus call centers in 18 different cities and 12 states. These witnesses expressed their understanding that

---

[1]   Maximus has obtained declarations from the following customer service representatives who have worked in Maximus call centers in various locations throughout the country, which are attached in support of this opposition: Declaration of Aaron McNeese ("McNeese Decl."); Declaration of Almeta McNear ("McNear Decl."); Declaration of Amy Barnes ("Barnes Decl."); Declaration of Amy Leatherman ("Leatherman Decl."); Declaration of Angelia Villescas ("Villescas Decl."); Declaration of Anthony Castillo ("Castillo Decl."); Declaration of Anthony White ("A. White Decl."); Declaration of Ashley Leon ("Leon Decl."); Declaration of Boguslawa Diaz ("Diaz

Maximus strictly prohibits CSRs from engaging in any "off-the-clock" work, and stated that in their experience, Maximus certainly does not require them to work "off-the-clock" and pays time-and-one-half for all overtime hours that CSRs work in a workweek.  (*See* McNear Decl. ¶¶ 5, 14; Milman Decl. ¶¶ 9, 15; Luna Decl. ¶¶ 6, 15; Medina Decl. ¶ 5.)[2]  CSRs confirmed that they have

---

Decl."); Declaration of Brian Milman ("Milman Decl."); Declaration of Briseida Dominguez Luna ("Luna Decl."); Declaration of Cameron Spencer ("Spencer Decl."); Declaration of Carlos Medina Jr. ("Medina Decl."); Declaration of Cassandra Sims ("Sims Decl."); Declaration of Cassondra Harden ("Harden Decl."); Declaration of Cheryl Miles ("Miles Decl."); Declaration of Cindy Molina ("Molina Decl."); Declaration of Cynthia Herrera ("Herrera Decl."); Declaration of Dana Granger ("Granger Decl."); Declaration of Danyell Taylor-Sanderson ("Taylor-Sanderson Decl."); Declaration of Eric Dalley ("Dalley Decl."); Declaration of Gladys Johnson ("Johnson Decl."); Declaration of Greg Teang ("Teang Decl."); Declaration of Iyashia Jarrett ("Jarrett Decl."); Declaration of Jacqueline Lucky ("Lucky Decl."); Declaration of Jahi Algeciras ("Algeciras Decl."); Declaration of Janet Ragsdale ("Ragsdale Decl."); Declaration of Jessica Landeros ("Landeros Decl."); Declaration of Jessica Mendoza ("Mendoza Decl."); Declaration of Johneen Jarratt ("Jarratt Decl."); Declaration of Julissa Valor ("Valor Decl."); Declaration of Kalel Ramot Edwards ("Edwards Decl."); Declaration of Karen Fisher ("Fisher Decl."); Declaration of Krystal Garcia ("Garcia Decl."); Declaration of Larisa Villareal ("Villareal Decl."); Declaration of Marcus McGeisey ("McGeisey Decl."); Declaration of Maria Paz ("Paz Decl."); Declaration of Maria Peguero ("Peguero Decl."); Declaration of Marissa Ibarra ("Ibarra Decl."); Declaration of Mayra Jasso ("Jasso Decl."); Declaration of Meshellie Boddie ("Boddie Decl."); Declaration of Michelle Tyree ("Tyree Decl."); Declaration of Mochel Duckett ("Duckett Decl."); Declaration of Monserrat Villalobos Valenzuela ("Valenzuela Decl."); Declaration of Nicole Ezell ("Ezell Decl."); Declaration of Octavia Bearden ("Bearden Decl."); Declaration of Omary Minier ("Minier Decl."); Declaration of Oscar Cuadra ("Cuadra Decl."); Declaration of Paula Workman ("Workman Decl."); Declaration of Raymond Saucier ("Saucier Decl."); Declaration of Rex Borgman ("Borgman Decl."); Declaration of Sandra Espinoza ("Espinoza Decl."); Declaration of Sasha Cousins ("Cousins Decl."); Declaration of Sheena Andrew-Barry ("Andrew-Barry Decl."); Declaration of Sheila Christensen ("Christensen Decl."); Declaration of Sherri Wigington ("Wigington Decl."); Declaration of Stephanie McClary ("McClary Decl."); Declaration of Susan Lumpkin ("Lumpkin Decl."); Declaration of Tonja Chisolm ("Chisolm Decl."); Declaration of Valerie Shackleford ("Shackleford Decl."); Declaration of Valerie White ("V. White Decl."); Declaration of Vanetta Siples ("Siples Decl."); Declaration of Vincent Tyre ("Tyre Decl."); Declaration of Yareli Ramirez ("Ramirez Decl."); and Declaration of Yesenia Moreno ("Moreno Decl.").

[2]     *See also* Molina Decl. ¶ 5; Dalley Decl. ¶ 5; Teang Decl. ¶ 7; Jarrett Decl. ¶ 5; Lucky Decl. ¶¶ 6, 11; Algeciras Decl. ¶ 10; Ragsdale Decl. ¶ 5; Landeros Decl. ¶¶ 5, 11; Mendoza Decl. ¶¶ 5, 11; Jarratt Decl. ¶ 15; Valor Decl. ¶¶ 5, 17; Fisher Decl. ¶ 15; Garcia Decl. ¶¶ 5, 9; Villareal Decl. ¶ 12; McGeisey Decl. ¶ 11; Paz Decl. ¶ 14; Peguero Decl. ¶ 17; Ibarra Decl. ¶ 13; Jasso Decl. ¶¶ 5, 14; Boddie Decl. ¶ 16; Tyree Decl. ¶ 15; Duckett Decl. ¶ 14; Valenzuela Decl. ¶ 15; Bearden Decl. ¶ 18; Minier Decl. ¶ 13; Cuadra Decl. ¶¶ 15, 9; Workman Decl. ¶ 14; Saucier Decl. ¶¶ 5, 15; Andrew Barry Decl. ¶¶ 11, 12, 14; Wigington Decl. ¶ 15; Christensen Decl. ¶¶ 9, 16, 17; Lumpkin

received training and periodic guidance on timekeeping practices to ensure that they are aware and understand that they are required to accurately track and report all of their working time, including any work performed outside of their scheduled shifts or during meal breaks, in Maximus's time-keeping system.  (McNeese Decl. ¶ 6; McNear Decl. ¶¶ 6, 13; Barnes Decl. ¶ 7; A. White Decl. ¶¶ 6, 14; Diaz Decl. ¶ 6; Luna Decl. ¶ 14; Spencer Decl. ¶ 6.)[3]

CSRs typically work an eight hour shift, five days per week for a total of forty hours in a week.  (McNeese Decl. ¶ 5; McNear Decl. ¶ 5; Leatherman Decl. ¶ 5; Barnes Decl. ¶ 5; Villescas Decl. ¶ 5; Castillo Decl. ¶ 5; A. White Decl. ¶ 5.)[4]  Contrary to Plaintiffs' allegations, dozens of CSRs stated that they are not required or expected to begin logging in to their computers and programs before their scheduled shift.  (Cuadra Decl. ¶¶ 7, 9; Workman Decl. ¶ 8; Saucier Decl. ¶¶ 7, 9; Borgman Decl. ¶ 12; Christensen Decl. ¶ 9; V. White Decl. ¶ 11; Tyre Decl. ¶¶ 9, 10; Moreno Decl. ¶¶ 8, 13, 21.)[5]  In fact, Maximus provides a two to seven minute "grace period" at

Decl. ¶¶ 9, 15; McClary Decl. ¶¶ 6, 20; Chisolm Decl. ¶ 15; Shackleford Decl. ¶ 16; Siples Decl. ¶¶ 5, 15; V. White Decl. ¶ 19; Tyre Decl. ¶ 5; Ramirez Decl. ¶ 15; Moreno Decl. ¶¶ 6, 13, 21; Leatherman Decl. ¶ 5; Barnes Decl. ¶ 6; Villescas Decl. ¶ 5; Leon Decl. ¶¶ 5, 13; Sims Decl. ¶¶ 5, 14; Harden Decl. ¶ 5; Castillo Decl. ¶¶ 12, 15; A. White Decl. ¶ 7; Diaz Decl. ¶¶ 5, 8.

[3]    *See also* Johnson Decl. ¶ 15; Teang Decl. ¶ 6; Jarrett Decl. ¶¶ 6, 8; Lucky Decl. ¶ 7; Algeciras Decl. ¶ 7; Ragsdale Decl. ¶ 15; Jarratt Decl. ¶ 6; Valor Decl. ¶ 15; Fisher Decl. ¶ 6; McGeisey Decl. ¶ 5; Peguero Decl. ¶ 6; Boddie Decl. ¶ 4; Duckett Decl. ¶ 6; Valenzuela Decl. ¶¶ 6, 9; Ezell Decl. ¶ 15; Bearden Decl. ¶ 6; Minier Decl. ¶ 6; Cuadra Decl. ¶ 6; Workman Decl. ¶ 6; Borgman Decl. ¶ 6; Cousins Decl. ¶ 6; Andrew-Barry Decl. ¶ 6; Christensen Decl. ¶ 5; Wigington Decl. ¶ 6; Lumpkin Decl. ¶ 14; McClary Decl. ¶ 7; Shackleford Decl. ¶ 6; Siples Decl. ¶¶ 6, 14; V. White Decl. ¶ 6; Tyre Decl. ¶ 6; Ramirez Decl. ¶ 14; Moreno Decl. ¶ 7; Leatherman Decl. ¶ 14; Granger Decl. ¶ 6; Taylor-Sanderson Decl. ¶ 12; Dalley Decl. ¶ 6; Sims Decl. ¶ 6; Herrera Decl. ¶ 15.

[4]    *See also* Bearden Decl. ¶ 5; Cuadra Decl. ¶ 5; Workman Decl. ¶ 5; Saucier Decl. ¶ 5; Wigington Decl. ¶ 5; Christensen Decl. ¶ 6; McClary Decl. ¶ 5; Lumpkin Decl. ¶ 5; Chisolm Decl. ¶ 6; Shackleford Decl. ¶ 5; Siples Decl. ¶ 5; V. White Decl. ¶ 5; Tyre Decl. ¶ 5; Ramirez Decl. ¶ 5; Moreno Decl. ¶ 5; Leon Decl. ¶ 5; Diaz Decl. ¶ 5; Milman Decl. ¶ 5.

[5]    *See also* McNeese Decl. ¶¶ 7, 8; McNear Decl. ¶¶ 8, 14; Leatherman Decl. ¶ 10; Barnes Decl. ¶ 8; Villescas Decl. ¶¶ 7, 8; Castillo Decl. ¶¶ 7, 15; A. White Decl. ¶¶ 7, 15; Diaz Decl. ¶ 8; Milman Decl. ¶¶ 9, 15; Luna Decl. ¶ 15; Spencer Decl. ¶¶ 7,11, 19; Medina Decl. ¶ 11; Sims Decl. ¶ 11; Harden Decl. ¶ 10; Molina Decl. ¶ 11; Herrera Decl. ¶ 16; Taylor-Sanderson Decl. ¶¶ 15, 22;

the beginning of the shift, depending on the call center, to allow CSRs time to log in to their computers and programs before placing themselves into "Ready" or "Available" status indicating they are ready to accept calls.  (McNeese Decl. ¶ 7 (three minutes); McNear Decl. ¶ 7 (three minutes); Spencer Decl. ¶ 7 (three minutes); Harden Decl. ¶ 7 (four minutes); Dalley Decl. ¶ 7 (three minutes); Algeciras Decl. ¶ 8 (two minutes); Ragsdale Decl. ¶ 7 (five minutes); Landeros Decl. ¶ 8 (four minutes); Jarratt Decl. ¶ 7 (three minutes); Edwards Decl. ¶ 11 (four minutes); Borgman Decl. ¶ 12 (seven minutes); Tyre Decl. ¶ 9 (six minutes).)[6]

During each eight-hour shift, CSRs receive a thirty-minute unpaid meal break and two fifteen-minute paid rest breaks.[7]  (*See, e.g.*, Johnson Decl. ¶ 12; Teang Decl. ¶ 5; Jarrett Decl. ¶ 10; Lucky Decl. ¶ 5; Fisher Decl. ¶ 5.)[8]  Dozens of CSRs indicated that they regularly take the full

---

Dalley Decl. ¶ 8; Johnson Decl. ¶ 10; Teang Decl. ¶¶ 7, 9; Jarrett Decl. ¶ 8; Lucky Decl. ¶¶ 11, 20; Algeciras Decl. ¶¶ 10, 16; Ragsdale Decl. ¶ 10; Landeros Decl. ¶ 10; Mendoza Decl. ¶ 9; Jarratt Decl. ¶ 9; Valor Decl. ¶ 16; Edwards Decl. ¶ 11; Fisher Decl. ¶¶ 9, 15; Villareal Decl. ¶ 9; McGeisey Decl. ¶ 9; Jasso Decl. ¶ 7; Boddie Decl. ¶¶ 10, 16; Tyree Decl. ¶¶ 9, 15; Duckett Decl. ¶ 14; Valenzuela Decl. ¶ 9; Ezell Decl. ¶ 9; Bearden Decl. ¶¶ 7, 11; Minier Decl. ¶¶ 8, 13; Espinoza Decl. ¶ 11; Ramirez Decl. ¶¶ 9, 15; Wigington Decl. ¶ 15; McClary Decl. ¶¶ 8, 20; Lumpkin Decl. ¶¶ 7, 15; Shackleford Decl. ¶ 16; Siples Decl. ¶¶ 7, 15.

[6]   *See also* Barnes Decl. ¶ 8 (three minutes); Castillo Decl. ¶ 7 (same); A. White Decl. ¶ 7 (same);  Diaz Decl. ¶ 7 (same); Milman Decl. ¶ 7 (same); Fisher Decl. ¶ 7 (same); Tyree Decl. ¶ 7 (same); Duckett Decl. ¶ 7 (same); Valenzuela Decl. ¶ 8 (same); Ezell Decl. ¶ 7 (same); Bearden Decl. ¶ 7 (same); Minier Decl. ¶ 7 (same); Cuadra Decl. ¶ 7 (same); Workman Decl. ¶ 7 (same); McClary Decl. ¶ 8 (same); Lumpkin Decl. ¶ 7 (same); Shackleford Decl. ¶ 7 (same); Siples Decl. ¶ 7 (same); Ramirez Decl. ¶ 7 (same); Moreno Decl. ¶¶  8, 9 (same); Johnson Decl. ¶ 9 (same); Jarrett Decl. ¶ 8 (same); Lucky Decl. ¶ 11 (same); Espinoza Decl. ¶ 11 (four minutes); Cousins Decl. ¶ 11 (seven minutes); Christensen Decl. ¶ 7 (three minutes); Wigington Decl. ¶ 9 (three minutes); Leatherman Decl. ¶ 7 (four to five minutes).

[7]   Some CSRs work different schedules.  (*See, e.g.*, Cousins Decl. ¶ 5 (37.5-hour work week, one-hour lunch); Luna Decl. ¶ 5 (45-minute lunch break); Miles Decl. ¶ 5 (one-hour lunch); Granger Decl. ¶ 5 (37.5-hour week and 45-minute lunch); Edwards Decl. ¶ 5 (30 to 45-minute meal break); McGeisey Decl. ¶ 4 (45-minute lunch break Chisolm Decl. ¶ 6 (40-hour week with a one-hour meal break).)

[8]   *See also* McNeese Decl. ¶ 5; McNear Decl. ¶ 5; Leatherman Decl. ¶ 5; Barnes Decl. ¶ 5; Villescas Decl. ¶ 5; Castillo Decl. ¶¶ 5, 11; A. White Decl. ¶¶ 5; Lumpkin Decl. ¶¶ 5, 11, 12; Shackleford Decl. ¶¶ 5, 12; Tyre Decl. ¶ ; Ramirez Decl. ¶¶ 5, 11; Tyre Decl. ¶ 12; Moreno Decl.

thirty-minute meal break, during which they are relieved of all work duties.  (Saucier Decl. ¶¶ 11, 12; Shackleford Decl. ¶¶ 12, 13; V. White Decl. ¶¶ 14, 19; Moreno Decl. ¶¶ 15, 16.)[9]

Similar to the beginning of the shift, CSRs may toggle their phone to stop calls from coming in and begin logging out of their programs a few minutes before their shift ends so that they have time within their scheduled shift to complete the log-out process and set their computers to restart before leaving for the day.  (Bearden Decl. ¶¶ 15, 16; McNeese Decl. ¶ 15; Shackleford Decl. ¶ 14; V. White Decl. ¶ 15.)[10]  Many CSRs described the time required for these tasks as minimal.  (Barnes Decl. ¶ 16 (process takes "seconds"); Luna Decl. ¶ 11 (less than 20 seconds); Spencer Decl. ¶ 16 (30 seconds); Miles Decl. ¶ 10 (35 seconds); Molina Decl. ¶ 10 (less than 10 seconds).)[11]  CSRs also stated they are not required to shut down or power their computers off at

---

¶¶ 5, 15; Ragsdale Decl. ¶ 5; Landeros Decl. ¶ 5; Mendoza Decl. ¶ 5; Algeciras Decl. ¶¶ 5, 12; Jarratt Decl. ¶¶ 5, 11; Valor Decl. ¶ 5.

[9]  *See also* McNeese Decl. ¶¶ 13, 14; McNear Decl. ¶¶ 10, 11; Barnes Decl. ¶¶ 14, 15; Castillo Decl. ¶¶ 11, 12; A. White Decl. ¶¶ 6, 11; Diaz Decl. ¶ 12;  Milman Decl. ¶ 12; Spencer Decl. ¶¶ 13, 14; Taylor-Sanderson Decl. ¶¶ 18, 19; Dalley Decl. ¶ 10; Johnson Decl. ¶¶ 12, 13; Teang Decl. ¶¶ 11, 12; Jarrett Decl. ¶ 11; Lucky Decl. ¶¶ 13, 14, 20; Algeciras Decl. ¶¶ 12, 13; Jarratt Decl. ¶ 11; Fisher Decl. ¶¶ 11, 12; Boddie Decl. ¶¶ 12, 13; Tyree Decl. ¶¶ 11, 12; Duckett Decl. ¶¶ 10, 11; Valenzuela Decl. ¶ 11; Ezell Decl. ¶¶ 11, 12; Bearden Decl. ¶¶ 13, 14; Minier Decl. ¶ 10; Cuadra Decl. ¶¶ 11, 12; Workman Decl. ¶¶ 10, 11; Wigington Decl. ¶ 12; Christensen Decl. ¶ 11; McClary Decl. ¶ 15; Lumpkin Decl. ¶ 12; Ramirez Decl. ¶ 12; Tyre Decl. ¶ 13.

[10]  *See also* A. White Decl. ¶ 13; Diaz Decl. ¶ 13; Milman Decl. ¶ 13; Spencer Decl. ¶ 16; Taylor-Sanderson Decl. ¶ 20; Dalley Decl. ¶ 11; Johnson Decl. ¶¶ 14, 15; Jarrett Decl. ¶ 12; Lucky Decl. ¶ 15; Algeciras Decl. ¶ 8; Jarratt Decl. ¶ 13; Fisher Decl. ¶ 13; Boddie Decl. ¶ 14; Tyree Decl. ¶ 13; Ezell Decl. ¶ 13; Minier Decl. ¶ 11; Workman Decl. ¶ 12; Christensen Decl. ¶ 12; Wigington Decl. ¶ 13; McNear Decl. ¶ 12; Barnes Decl. ¶ 16; Leatherman Decl. ¶ 11; Castillo Decl. ¶ 13; McClary Decl. ¶ 16; Moreno Decl. ¶ 17; Tyre Decl. ¶ 14.

[11]  *See also* Castillo Decl. ¶ 13 (two to three minutes); Leon Decl. ¶ 10 (approximately two minutes); Herrera Decl. ¶¶ 11, 13 (no more than 32 seconds total); Johnson Decl. ¶ 14 (approximately 13 seconds); Lucky Decl. ¶¶ 15, 18 (approximately ten seconds); Ragsdale Decl. ¶ 11 (5 to 10 seconds); Mendoza Decl. ¶ 8 (20 to 30 seconds); Jarratt Decl. ¶ 13 (less than one minute); Valor Decl. ¶ 12 ("no more than a few seconds"); Edwards Decl. ¶ 10 (approximately 6 seconds); Duckett Decl. ¶ 12 (less than 1.5 minutes); Cuadra Decl. ¶ 13 (approximately 30 seconds total); Borgman Decl. ¶ 11 (ten seconds); Espinoza Decl. ¶ 10 (approximately 32 seconds); Andrew-Barry Decl. ¶ 10 (10 seconds); Cousins Decl. ¶ 10 (approximately 30 seconds); Christensen Decl.

the end of the shift, or remain at their computers during any restart process.  (*See* Tyre Decl. ¶ 14; Siples Decl. ¶¶ 13, 16; Ramirez Decl. ¶ 13.)[12]

Although CSRs may experience technical issues and failures with their computers or programs from time to time, many of them described a process whereby they place their phones in an "Aux" or "unavailable" mode that blocks calls while they troubleshoot the technical issue. (McNear Decl. ¶ 7; McClary Decl. ¶ 13; V. White Decl. ¶ 12; Siples Decl. ¶ 10; Tyre Decl. ¶ 11.)[13] Many CSRs also confirmed that, during any period of technical issue or failure, they remain on the clock and are paid for the time they spend troubleshooting the issue.  (Christensen Decl. ¶ 10; Siples Decl. ¶ 10; Ramirez Decl. ¶ 10; Tyre Decl. ¶ 11.)[14]

---

¶ 13 (1.5 minutes total); Lumpkin Decl. ¶ 13 ("a few seconds"); Shackleford Decl. ¶ 14 (under one minute); V. White Decl. ¶ 17 (one to two minutes); Ramirez Decl. ¶ 13 (under two minutes); Moreno Decl. ¶ 17 (less than a minute); Medina Decl. ¶ 10 (approximately one minute); Sims Decl. ¶ 10 (up to 8 seconds); Harden Decl. ¶ 11 (approximately 5 seconds).

[12]   *See also* McNeese Decl. ¶ 17; McNear Decl. ¶¶ 12, 15; Barnes Decl. ¶ 18; Leatherman Decl. ¶ 12; Villescas Decl. ¶ 9; Castillo Decl. ¶¶ 13, 16; A. White Decl. ¶¶ 13, 16; Leon Decl. ¶ 11; Diaz Decl. ¶ 14; Wigington Decl. ¶ 16; McClary Decl. ¶ 21; Chisolm Decl. ¶ 12; Milman Decl. ¶ 16; Spencer Decl. ¶ 18; Sims Decl. ¶¶ 10, 12; Harden Decl. ¶ 12; Molina Decl. ¶¶ 10, 12; Herrera Decl. ¶¶ 14, 16; Dalley Decl. ¶ 15; Jarrett Decl. ¶ 15; Lucky Decl. ¶ 18; Algeciras Decl. ¶ 17; Ragsdale Decl. ¶ 12; Mendoza Decl. ¶ 10; Valor Decl. ¶¶ 12, 16; Edwards Decl. ¶¶ 10, 12; Fisher Decl. ¶¶ 13, 16; McGeisey Decl. ¶ 10; Paz Decl. ¶ 12; Peguero Decl. ¶ 15; Ibarra Decl. ¶ 11; Jasso Decl. ¶ 11; Duckett Decl. ¶¶ 12, 15; Valenzuela Decl. ¶¶ 13, 16; Ezell Decl. ¶ 14; Minier Decl. ¶ 14; Cuadra Decl. ¶ 16; Workman Decl. ¶ 15; Saucier Decl. ¶ 16; Borgman Decl. ¶¶ 11, 13; Espinoza Decl. ¶¶ 10, 12; Andrew-Barry Decl. ¶ 10; Cousins Decl. ¶¶ 10, 12; Christensen Decl. ¶ 15; Shackleford Decl. ¶ 17; V. White Decl. ¶ 17; Moreno Decl. ¶ 19.

[13]   *See also* Barnes Decl. ¶ 13; Castillo Decl. ¶¶ 8, 10; Harden Decl. ¶ 9; Taylor-Sanderson Decl. ¶ 17; Dalley Decl. ¶ 9; Johnson Decl. ¶ 11; Teang Decl. ¶ 10; Lucky Decl. ¶ 12; Fisher Decl. ¶ 10; Valenzuela Decl. ¶ 10; Minier Decl. ¶ 9; Cuadra Decl. ¶ 10; Saucier Decl. ¶ 10; Wigington Decl. ¶ 10.

[14]   *See also* McNeese Decl. ¶ 12; McNear Decl. ¶ 7; Barnes Decl. ¶ 13; Castillo Decl. ¶ 10; Diaz Decl. ¶ 9; Milman Decl. ¶ 10; Spencer Decl. ¶ 12; Taylor-Sanderson Decl. ¶ 17; Dalley Decl. ¶ 9; Johnson Decl. ¶ 11; Teang Decl. ¶ 10; Jarrett Decl. ¶ 9; Lucky Decl. ¶ 12; Algeciras Decl. ¶ 11; Fisher Decl. ¶ 10; Boddie Decl. ¶ 11; Tyree Decl. ¶ 10; Valenzuela Decl. ¶ 10; Ezell Decl. ¶ 10; Bearden Decl. ¶ 12; Minier Decl. ¶ 9; Cuadra Decl. ¶ 10; Workman Decl. ¶ 9; Saucier Decl. ¶ 10; Borgman Decl. ¶¶ 7, 14; McClary Decl. ¶ 13; Lumpkin Decl. ¶ 10; Shackleford Decl. ¶ 11; V. White Decl. ¶ 12; Cousins Decl. ¶ 7; Wigington Decl. ¶ 10.

## LEGAL STANDARD

Maximus recognizes that courts in this district, and throughout much of the country, have for roughly the past thirty years applied a two-stage conditional certification / decertification process when deciding whether to authorize notice to individuals who may be similarly situated to the named plaintiffs in a putative FLSA collective action. Until recently, no federal court of appeals had squarely held that this approach is correct under the law, though a number of courts have at least acknowledged that standard and tacitly acceded to it.

Earlier this year, however, the U.S. Court of Appeals for the Fifth Circuit issued the first appellate decision directly considering the propriety of the two-stage process, in a case certified for interlocutory review after the district court granted conditional certification. In *Swales v. KLLM Transportation Services, LLC*, 985 F.3d 430 (5th Cir. 2021), the court held that the concept of conditional certification under a lenient standard, followed by a more demanding review at the decertification stage, is contrary to both the letter and the spirit of the FLSA. *See id.* at 434-43. "[T]he district court's job is ensuring that notice goes out to those who are 'similarly situated,' in a way that scrupulously avoids endorsing the merits of the case." *Id.* at 440. The court concluded that "a district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.' And then it should authorize preliminary discovery accordingly." *Id.* at 441. As the court observed, "addressing these issues from the outset aids the district court in deciding whether notice is necessary. And it ensures that any notice sent is proper in scope—that is, sent only to potential plaintiffs." *Id.* at 442. In making this determination, "the district court needs to consider all of the available evidence." *Id.* In the Fifth Circuit's view, "the FLSA's similarity requirement is something that district courts should rigorously enforce at the outset of the litigation." *Id.* at 443.

Maximus urges the Court to apply the *Swales* framework here.  Under that approach, Plaintiffs have not come close to establishing that they are similarly situated to anyone other than themselves.  Even if the Court is not prepared to deny certification outright, the proper course of action under *Swales* would be to order discovery focused on whether the group Plaintiffs seek to represent is, in fact, similarly situated for purposes of the issues in this case.[15]

If the Court is not persuaded to apply *Swales*, and is otherwise inclined to grant conditional certification under the traditional two-stage process, then Maximus requests that the Court certify the matter for interlocutory appeal under 28 U.S.C. § 1292(b).  This case meets that standard in light of (1) the controlling question of law; (2) the clear division of authority on this issue, which has been further brought into relief in light of *Swales*; and (3) the ability of this question to materially advance the ultimate resolution of this matter.  Indeed, the district court in *Swales* held that this exact issue merits interlocutory review, and the Fifth Circuit granted review on that basis. 985 F.3d at 439.  Addressing this legal issue is critical to facilitating an expeditious resolution of this matter by defining the proper scope of this case, which Maximus contends is the eight named Plaintiffs currently before the Court, and not the thousands of individuals across the country to whom Plaintiffs seek to send notice.  Accordingly, if the Court declines to apply *Swales* and is inclined to grant conditional certification, Maximus requests the opportunity to present this legal question to the Fourth Circuit to address directly the proper standard for certifying an FLSA collective action.

---

[15]  Maximus acknowledges that at least one judge in this district has declined to follow *Swales*, although that court nevertheless denied the plaintiff's motion for conditional certification based on its finding that the plaintiff "failed to demonstrate that the putative class [was] either similarly situated or subject to a common policy that violated the law" even "under the more lenient standard applied by courts in this District."  *See Winks v. Dep't of Transp.*, No. 20 Civ. 420 (HEH), 2021 WL 2482680, at *2, n. 3 (E.D. Va. June 17, 2021).

## ARGUMENT

Whether the Court applies the *Swales* approach of rigorously examining the similarly situated standard at the outset of the case or, instead, applies the two-stage process, the outcome on this record is the same:  Plaintiffs' motion must be denied.  Plaintiffs are demonstrably dissimilar to the individuals they seek to represent.  Under clear case law, this litigation should not proceed on a collective basis.

**I.   PLAINTIFFS FAIL TO DEMONSTRATE THAT THEY ARE SIMILARLY SITUATED TO THE THOUSANDS OF MEMBERS OF THE PROPOSED COLLECTIVE ACROSS THE COUNTRY.**

**A.   Courts Routinely Deny Conditional Certification When Claims Require Individualized Analyses Of Important Issues.**

Irrespective of which approach the Court follows, determination of the appropriateness of collective action certification and court-facilitated notice is left to the Court's discretion.  *See Choimbol v. Fairfield Resorts, Inc.*, 475 F. Supp. 2d 557, 563 (E.D. Va. 2006); *D'Anna v. M/A–COM, Inc.*, 903 F. Supp. 889, 893 (D. Md. 1995).  Even under the two-step framework, although Plaintiffs need only put forward "relatively modest" evidence that they are similarly situated in order to obtain approval to proceed as a class, *see D'Anna*, 903 F. Supp. at 894, "[w]hen sufficient evidence in the record at the initial 'notice' stage makes it clear that notice is not appropriate, . . . a court can . . . deny certification outright." *Purdham v. Fairfax Cty. Pub. Sch.*, 629 F. Supp. 2d 544, 547 (E.D. Va. 2009).  In particular, a court may determine that conditional certification is inappropriate where multiple claims cannot be adjudicated efficiently because they would require "substantial individualized determinations for each class member." *Purdham*, 629 F. Supp. 2d at 549; *see also England v. New Century Fin. Corp.,* 370 F. Supp. 2d 504, 511 (M.D. La. 2005) (finding conditional certification inappropriate where adjudication of a collective action would have required factual inquiries into employment relationships involving different managers at

different geographic locations throughout the country, and where a finding of liability at one location would not necessarily lead to a finding of liability at another location). Further, courts may refuse to conditionally certify a class on the ground that a purported corporate policy was not "uniformly or systematically implemented at any given [location]." *Basco v. Wal–Mart Stores, Inc.*, No. 00 Civ.A. 3184, 2004 WL 1497709, *7 (E.D. La. July 2, 2004) (alleged policy to keep wages low had effects that were "neither homogeneous nor [lent] themselves to collective inquiry," as the evidence showed it was not uniformly implemented).

Courts have likewise decertified FLSA cases where plaintiffs were subject to varying work conditions based on their work locations and/or local managers.[16] In *Johnson v. TGF Precision Haircutters, Inc.*, No. 03 Civ.A. H 3641, for instance, the court granted the defendant's motion for decertification because, *inter alia*, class members worked at numerous locations and pay policies seemed to vary by location. 2005 WL 1994286, at *3-4, 8 (S.D. Tex. Aug. 17, 2005). Another court decertified a class of telephone sales consultants because the plaintiffs' claims "relie[d] on a subtler system of pressure and coercion that, ultimately, appears to have to have been backed or not by the individual managers," and the plaintiffs "were not affected equally or in the same manner by this system." *Brechler v. Qwest Commc'ns Int'l, Inc.*, No. 06 Civ. 00940 (PHX) (ROS), 2009 WL 692329, at *3 (D. Ariz. Mar. 17, 2009).

## B. The Record Demonstrates That Individualized Circumstances Preclude A Finding That The Proposed Collective Is Similarly Situated.

Here, the alleged practices and procedures upon which Plaintiffs premise their claims vary

---

[16] Maximus acknowledges that courts ordinarily apply a different and more rigorous standard at the decertification stage than at the certification stage. These cases granting decertification demonstrate that *Swales* is the better approach, insofar as it serves no legitimate policy under the FLSA to conditionally certify a collective early in the case only to undertake the "real" similarly situated analysis later on, after the dissimilarities in the collective require decertifying the matter and scattering dissimilar plaintiffs to the wind.

not only by facility but by individual.  Sixty-five declarations from CSRs working for Maximus in multiple states demonstrate the highly individualized nature of Plaintiffs' theories of liability.

As just one example, although Plaintiffs assert that Maximus universally required them and other CSRs to "*start* and log-in to their computer, open multiple different Maximus computer programs, log in to each Maximus program, and ensure that each Maximus program is running correctly" for "up to thirty (30) minutes or longer" while "off-the-clock" (Compl. ¶¶ 55, 56, 59; emphasis added), signed declarations from CSRs working in Maximus call centers across the country confirm that Plaintiffs' purported experiences are in no way representative of the experiences of other CSRs.  While some CSRs stated that they log into their computers and programs a few minutes before the scheduled start of their shifts, many do not.  Indeed, many CSRs have confirmed that they do not begin logging in to their computers or programs until their scheduled start time, and/or that Maximus in fact *prohibits* them from logging in any earlier than a few minutes before their shift begins.  (Cuadra Decl. ¶¶  7, 9; Saucier Decl. ¶¶ 7, 9; Andrew-Barry Decl. ¶ 11; Christensen Decl. ¶ 7; Lumpkin Decl. ¶ 9; McClary Decl. ¶¶ 8, 12.)[17]  Moreover, many CSRs confirmed that Maximus provides a grace period at the beginning of the shift to allow CSRs to log on to their computers and in to their programs before they are expected to be available to accept calls.  (Leatherman Decl. ¶ 7; Barnes Decl. ¶ 8; Castillo Decl. ¶ 7; A. White Decl. ¶ 7.)[18]

---

[17]   *See also* McNeese Decl. ¶ 7; McNear Decl. ¶¶ 7, 8; Castillo Decl. ¶ 9; A. White Decl. ¶¶ 7, 9; Diaz Decl. ¶ 9; Spencer Decl. ¶¶ 7, 11, 19; Dalley Decl. ¶ 8; Johnson Decl. ¶¶ 9, 10; Teang Decl. ¶¶ 7, 9; Jarrett Decl. ¶ 8; Lucky Decl. ¶ 11; Algeciras Decl. ¶ 9; Ragsdale Decl. ¶ 7; Jarratt Decl. ¶ 7; Peguero Decl. ¶ 10; Boddie Decl. ¶ 7; Valenzuela Decl. ¶ 9; Bearden Decl. ¶ 8; V. White Decl. ¶ 1; Siples Decl. ¶ 9; Tyre Decl. ¶¶ 9, 10; Ramirez Decl. ¶ 9; Moreno Decl. ¶¶ 8, 13.

[18]   *See also* Johnson Decl. ¶ 9; Jarrett Decl. ¶ 8; Lucky Decl. ¶ 11; Algeciras Decl. ¶ 8; Ragsdale Decl. ¶ 7; Landeros Decl. ¶ 8; Jarratt Decl. ¶ 7; Edwards Decl. ¶ 11; Fisher Decl. ¶ 7; Tyree Decl. ¶ 7; Duckett Decl. ¶ 7; Valenzuela Decl. ¶ 8; Ezell Decl. ¶ 7; Bearden Decl. ¶ 8; Minier Decl. ¶ 7; Cuadra Decl. ¶ 7; Workman Decl. ¶ 7; Borgman Decl. ¶ 12; Cousins Decl. ¶ 11; Christensen Decl. ¶ 7; Wigington Decl. ¶ 9; McClary Decl. ¶¶ 8, 12; Lumpkin Decl. ¶ 7; Shackleford Decl.

Indeed, numerous CSRs stated that the time it takes to complete the log in process at the start of their shift is much shorter than any provided grace period, and certainly nowhere near as long as Plaintiffs contend.  (McNeese Decl. ¶ 9 (less than two minutes); McNear Decl. ¶ 7 (less than three minutes); Barnes Decl. ¶ 10 (one to three minutes); Leatherman Decl. ¶ 8 (30 seconds); Castillo Decl. ¶ 8 (50 seconds).)[19]  While some CSRs choose to arrive at the call center and/or log in a few minutes early, they acknowledged that this is because of personal preference, not because Maximus requires them to do so.  (*See, e.g.*, McNeese Decl. ¶ 8; Barnes Decl. ¶ 12; Tyree Decl. ¶ 8; Espinoza Decl. ¶ 7; Wigington Decl. ¶ 7.)[20]  Dozens of CSRs confirmed that, contrary to Plaintiffs' assertions, they do not need to "start" or "boot up" their computers at the beginning of their shifts, as their computers are already on when they arrive at the facility.  (*See* McClary Decl. ¶ 10; Lumpkin Decl. ¶ 8; Chisolm Decl. ¶ 9; V. White Decl. ¶ 8; Siples Decl. ¶ 8.)[21]

---

¶ 7; Siples Decl. ¶ 7; V. White Decl. ¶ 9; Tyre Decl. ¶ 9; Diaz Decl. ¶ 7; Milman Decl. ¶ 7;  Spencer Decl. ¶¶ 7, 8; Harden Decl. ¶ 7; Dalley Decl. ¶ 7; Ramirez Decl. ¶ 7; Moreno Decl. ¶¶ 8, 9, 10; McNeese Decl. ¶¶ 7, 10; McNear Decl. ¶ 7.

[19]   *See also* Milman Decl. ¶ 8 (2.5 minutes); Spencer Decl. ¶ 9 (one to two minutes); Harden Decl. ¶ 7 (no more than one minute); Jarrett Decl. ¶ 7 (less than two minutes); Lucky Decl. ¶ 9 (less than three minutes); Ragsdale Decl. ¶ 7 (less than two minutes); Edwards Decl. ¶ 8 (less than one minute); Duckett Decl. ¶ 8 (one to two minutes); Valenzuela Decl. ¶ 7 (two minutes); Ezell Decl. ¶8 (three minutes); Bearden Decl. ¶ 9 (one to three minutes); Cuadra Decl. ¶ 8 (approximately two minutes); Borgman Decl. ¶ 10 ("less than 3 minutes in total, and probably closer to 1 or 2 minutes") Christensen Decl. ¶ 7 (one or two minutes); Lumpkin Decl. ¶ 8 (approximately two minutes); McClary Decl. ¶ 10 (one to three minutes, always within grace period); Shackleford Decl. ¶ 8 (approximately three minutes); V. White Decl. ¶ 9 (less than one minute); Ramirez Decl. ¶ 8 (approximately 2.5 minutes); Moreno Decl. ¶ 10 (one to three minutes).

[20]   *See also* Villescas Decl. ¶ 8; Diaz Decl. ¶¶ 7, 8; Medina Decl. ¶ 11; Sims Decl. ¶ 7; Granger Decl. ¶ 7; Dalley Decl. ¶ 7; Johnson Decl. ¶ 7; Landeros Decl. ¶ 8; Jarratt Decl. ¶ 8; Valor Decl. ¶ 7; McGeisey Decl. ¶ 6; Peguero Decl. ¶ 8.

[21]   *See also* McNeese Decl. ¶ 9; Barnes Decl. ¶ 10; Villescas Decl. ¶ 7; Castillo Decl. ¶ 8; A. White Decl. ¶ 8; Leon Decl. ¶ 8; Diaz Decl. ¶ 7; Milman Decl. ¶ 8; Spencer Decl. ¶ 9; Sims Decl. ¶ 7; Miles Decl. ¶ 7; Molina Decl. ¶ 7; Herrera Decl. ¶ 8; Dalley Decl. ¶ 7; Johnson Decl. ¶ 8; Lucky Decl. ¶ 9; Mendoza Decl. ¶ 7; Jarratt Decl. ¶ 8; Edwards Decl. ¶ 8; Fisher Decl. ¶ 8; Garcia Decl. ¶ 6; Villareal Decl. ¶ 7; McGeisey Decl. ¶ 7; Peguero Decl. ¶ 7; Jasso Decl. ¶ 8; Tyree Decl.

Similarly, although Plaintiffs allege that Maximus required them and other CSRs to perform work after the end of their shifts by requiring them to "carefully log out of each of Maximus's programs," "fully shut down their computer," and "perform a specific computer shut down process" after clocking out (Compl. ¶¶ 83, 84), CSRs from multiple different facilities—*including the call centers at which Plaintiffs Thomas, Garner, Fowler, Gilvin, and Vick have worked, respectively*—have attested that they need not shut down their computers at the end of their shifts, much less wait at their workstations during any shut-down process. (*See, e.g.*, Edwards Decl. ¶ 10; Jasso Decl. ¶ 11; Wigington Decl. ¶¶ 13, 16; V. White Decl. ¶ 17.)[22] Other CSRs have stated that although Maximus expects them to restart their computers at the end of the day, the Company does not expect or require them to wait at their workstations during the restart process, and that setting the computer to restart takes mere seconds. (*See, e.g.*, McNeese Decl. ¶¶ 17, 20; Dalley Decl. ¶ 11; Moreno Decl. ¶ 16.)[23] Moreover, many CSRs confirmed that they have a grace period at the end of the shift such that the log-out process may be completed *before* their scheduled end time and while still on the clock. (*See, e.g.*, V. White Decl. ¶ 15; Tyre Decl. ¶ 14; Moreno Decl. ¶ 12.)[24]

---

¶ 8; Duckett Decl. ¶ 8; Minier Decl. ¶ 7; Cuadra Decl. ¶ 8; Workman Decl. ¶ 7; Saucier Decl. ¶ 8; Espinoza Decl. ¶ 7; Wigington Decl. ¶ 8; Ramirez Decl. ¶ 8; Tyre Decl. ¶ 7; Moreno Decl. ¶ 10.

[22]   *See also* McNeese Decl. ¶ 17; McNear Decl. ¶ 12; Leatherman Decl. ¶ 12; Leon Decl. ¶ 11; Diaz Decl. ¶ 17; Spencer Decl. ¶ 18; Harden Decl. ¶ 12; Miles Decl. ¶ 11; Lucky Decl. ¶ 18; Ragsdale Decl. ¶ 12; Chisolm Decl. ¶ 12; Paz Decl. ¶ 12.

[23]   *See also* McNear Decl. ¶ 12; Barnes Decl. ¶¶ 18, 21; Leatherman Decl. ¶ 12; Villescas Decl. ¶¶ 9, 10; Castillo Decl. ¶¶ 13, 16; Leon Decl. ¶ 11; Diaz Decl. ¶ 17; Milman Decl. ¶ 13; Spencer Decl. ¶ 20; Medina Decl. ¶ 10; Harden Decl. ¶ 12; Molina Decl. ¶¶ 10, 12; Herrera Decl. ¶ 14; Ragsdale Decl. ¶ 12; Landeros Decl. ¶ 9; Mendoza Decl. ¶ 10; Jarratt Decl. ¶ 13; Valor Decl. ¶ 12; Edwards Decl. ¶¶ 10, 12; Fisher Decl. ¶¶ 13, 16; Villareal Decl. ¶ 10; McGeisey Decl. ¶ 8; Paz Decl. ¶ 12; Ibarra Decl. ¶ 11; Jasso Decl. ¶ 10; Boddie Decl. ¶ 14; Valenzuela Decl. ¶¶ 13, 16; Ezell Decl. ¶ 14; Bearden Decl. ¶ 17; Cuadra Decl. ¶ 13; Borgman Decl. ¶¶ 13; Espinoza Decl. ¶¶ 10, 12; Siples Decl. ¶ 13; Ramirez Decl. ¶¶ 13, 16; Tyre Decl. ¶ 14.

[24]   *See also* McNeese Decl. ¶ 15; McNear Decl. ¶ 12; Barnes Decl. ¶ 16; Castillo Decl. ¶ 13; A. White Decl. ¶ 13; Diaz Decl. ¶ 13; Milman Decl. ¶ 13; Spencer Decl. ¶ 16; Taylor-Sanderson Decl. ¶ 20; Dalley Decl. ¶ 11; Jarrett Decl. ¶ 12; Lucky Decl. ¶ 15; Algeciras Decl. ¶ 12; Duckett

With respect to meal breaks, Plaintiffs allege that they and other CSRs "are required to stay on the clock and on call until the minute their meal break begins, clock out, then log out of the phone system or otherwise go into an aux mode, and then log off their computer prior to leaving their desk for their meal break," and that they must "log back into their computer, perform a restart process, log back into the phone system, then clock in, and be back on the phone right at the moment their meal break ends." (Compl. ¶¶ 66, 67.) Plaintiff allege this process can take two to six minutes. (*See* Compl. ¶¶ 68, 69.) Multiple CSRs stated, however, that they may put their phone into an "unavailable" mode *before* the time their scheduled meal break begins to prevent further calls and to start their meal break on time. (*See, e.g.*, Castillo Decl. ¶ 11; Fisher Decl. ¶ 11; Duckett Decl. ¶ 10; Valenzuela Decl. ¶ 11.)[25] In addition, CSRs consistently confirmed that if a call went past their scheduled meal break time, they still took a full 30-minute lunch. (*See, e.g.*, Barnes Decl. ¶ 15; Castillo Decl. ¶ 12; Diaz Decl. ¶ 12; Milman Decl. ¶ 11.)[26] Rather than "log off" their computers, many CSRs simply locked the computer, which took mere seconds. (*See, e.g.*, McNeese Decl. ¶ 13; McNear Decl. ¶ 9; Barnes Decl. ¶ 15; Milman Decl. ¶ 11.)[27]

---

Decl. ¶ 12; Ezell Decl. ¶ 13; Bearden Decl. ¶ 15; Minier Decl. ¶ 11; Workman Decl. ¶ 12; Cousins Decl. ¶ 10; Christensen Decl. ¶ 12; Wigington Decl. ¶¶ 9, 14; McClary Decl. ¶ 16; Lumpkin Decl. ¶¶ 13, 16; Shackleford Decl. ¶ 14.

[25]   *See also* Workman Decl. ¶ 11; Saucier Decl. ¶ 11; Tyre Decl. ¶ 12; Moreno Decl. ¶ 16; Spencer Decl. ¶ 14; Teang Decl. ¶ 11; Jarrett Decl. ¶ 10; Lucky Decl. ¶ 13; Jarratt Decl. ¶ 11; Milman Decl. ¶ 10.

[26]   *See also* Taylor-Sanderson Decl. ¶¶ 18, 19; Dalley Decl. ¶ 10; Johnson Decl. ¶¶ 12, 13; Teang Decl. ¶ 12; Jarrett Decl. ¶ 11; Lucky Decl. ¶ 13; Algeciras Decl. ¶ 13; Jarratt Decl. ¶ 11; Fisher Decl. ¶ 12; Boddie Decl. ¶ 12; Tyree Decl. ¶ 12; Duckett Decl. ¶ 11; Valenzuela Decl. ¶ 12; Ezell Decl. ¶ 12; Bearden Decl. ¶ 14; Minier Decl. ¶ 10; Cuadra Decl. ¶ 12; Workman Decl. ¶ 11; Saucier Decl. ¶ 12; McClary Decl. ¶ 15; Lumpkin Decl. ¶ 12; Shackleford Decl. ¶ 13; V. White Decl. ¶ 19; Siples Decl. ¶ 11; Ramirez Decl. ¶ 12; McNeese Decl. ¶ 14; McNear Decl. ¶ 11; Moreno Decl. ¶¶ 15, 16.

[27]   *See also* Spencer Decl. ¶ 14; Johnson Decl. ¶ 12; Jarrett Decl. ¶ 10; Lucky Decl. ¶ 14; Jarratt Decl. ¶ 11; Fisher Decl. ¶ 11; Duckett Decl. ¶ 10; Bearden Decl. ¶ 14; Cuadra Decl. ¶ 11; McClary Decl. ¶ 15; Lumpkin Decl. ¶ 11; Siples Decl. ¶ 11; Tyre Decl. ¶ 12; Moreno Decl. ¶ 16.)

Plaintiffs additionally allege that the computers and programs they and other CSRs used "crashed multiple times each week" and that they were required, without compensation, to "reboot [the computers] and complete the start-up process again—log back into their computers, open and sign back into each of their programs, ensure that each program is up and running, clock back in, and resume their work—which took ten (10) minutes or more each time." (Compl. ¶¶ 74, 75, 76, 77.) But numerous CSRs stated that such technical issues and failures did not occur as frequently as Plaintiffs allege, and, irrespective of the process or the time it took to resolve such issues or failures, they confirmed that they remained on the clock and were paid for all time spent for troubleshooting technical issues and computer failures. (McNeese Decl. ¶ 12 (1-2 issues in the past year); McNear Decl. ¶ 7 (paid for technical issue time); Barnes Decl. ¶ 13 (not common, and never had an issue getting paid for time dealing with technical issue); Castillo Decl. ¶ 20 (two issues in six months); Milman Decl. ¶ 10 (two to three issues in last year).)[28]

---

[28]  *See also* Spencer Decl. ¶ 12 (technical issues uncommon—"a couple times" per month—and troubleshooting time paid); Taylor-Sanderson Decl. ¶ 17 (no computer issues in 8 months); Dalley Decl. ¶ 9 (technical issues once every six months, submits exception report and is paid); Johnson Decl. ¶ 11 (at most 5 or 6 times in the last year, and remains clocked in); Teang Decl. ¶ 10 ("rarely" experiences technical issues, remains clocked in); Jarrett Decl. ¶ 9 (once a month and fully paid); Algeciras Decl. ¶ 11 (clocked in and paid); Fisher Decl. ¶ 10 (6 times in one year, clocked in and paid) (two times in the last year, clocked in and paid); Valenzuela Decl. ¶ 10 (four times in past six months, and paid); Ezell Decl. ¶ 10 (one time in a year, and paid); Bearden Decl. ¶ 12 ("maybe once a month," and note on timesheet to be paid); Cuadra Decl. ¶ 10 (three in the last six months and paid); Workman Decl. ¶ 9 (two issues in past several months, paid); Saucier Decl. ¶ 10 (minor issues five times in six months and paid); Christensen Decl. ¶ 10 ("occasional" minor issues, "very rare" major issues once a year, if that, and paid); McClary Decl. ¶ 13 ("can't recall an instance of having a technical issue" but knows it would be paid); Lumpkin Decl. ¶ 10 (cannot recall issues in the past six months, but knows it would be paid); V. White Decl. ¶ 12 (once every 5 to 6 months and paid); Siples Decl. ¶ 10 (only 4 to 5 times in the last year, clocked in and paid); Ramirez Decl. ¶ 10 (clocked in and paid for technical issues); Tyre Decl. ¶ 11 (clocked in and paid for troubleshooting issues); Moreno Decl. ¶ 14 (experiences technical issues "rarely" and puts note in timesheet "to make sure the time spent resolving the issue is accounted for"); Diaz Decl. ¶ 9 (submitted exception report to be paid for time spent on technical issues).

In short, the CSR declarations collected by Maximus demonstrate that the time at which each CSR begins logging into his or her computer and programs, the specific steps each CSR takes to ensure he or she is able to take the full 30-minute meal break, the decisions each CSR makes to address and report technical issues, and the time at which each CSR begins and completes the log out process before leaving the facility each day are driven by individual decisions and vary in myriad ways.  Further, aside from their own assertions and those of four other members of the purported collective, Plaintiffs have offered no evidence to suggest that Maximus maintains or ever maintained a uniform national policy of denying appropriate compensation for employee hours worked over 40 in a given week.  In fact, the only concrete evidence before the Court relevant to a national policy with respect to work hours and compensation is Maximus's *lawful* policy of requiring CSRs to timely be prepared to take their first call and providing a grace period at the start of each shift to allow them to do so, and *lawful* policy of automatically deducting a 30-minute meal break in each shift.  In these circumstances, "[t]here is no question but that adjudication of the multiple claims [asserted by Plaintiffs] in this case would require 'substantial individualized determinations for each class member.'"  *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 687 (D. Md. 2010).

**C.     The Need For Extensive Individualized Inquiries Renders Any Collective Action Unmanageable.**

Courts regularly exercise their discretion and take the manageability of a proposed collective into account at the certification stage.  *See, e.g.*, *D'Anna,* 903 F. Supp. at 894 ("As a matter of sound case management, a court should, before offering [to assist plaintiff in locating additional plaintiffs], make a preliminary inquiry as to whether a manageable class exists." (quoting *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266–67 (D. Minn.1991))); *Camper v. Home Quality Management Inc.*, 200 F.R.D. 516, 520 (D. Md. 2000) (same); *Purdham*, 629 F.

Supp. 2d at 552 (concluding, at the notice stage, that certification would be inappropriate because adjudication of multiple claims would require inefficient, individualized factual inquiries). Ultimately, the significance of manageability concerns is, like other aspects of the certification analysis, a decision committed to the Court's discretion on the facts before it. *See Purdham*, 629 F. Supp. 2d at 548 (noting that the district court has broad discretion to determine whether "a collective action is the appropriate means for prosecuting an [FLSA] action"); *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) ("The decision to create an opt-in class under § 216(b), like the decision on class certification under Rule 23, remains soundly within the discretion of the district court.").

Given the clear and substantial variation and individualized work experiences of CSRs demonstrated in the evidentiary record, "the adjudication of [Plaintiffs' claims] would require the parties, the Court, and perhaps eventually a jury, to engage in an unmanageable assortment of individualized inquiries." *Syrja*, 756 F. Supp. 2d at 688.  At a minimum, these inquiries would require an examination of each putative collective member's individual activities and decisions—across multiple states throughout the country, in call centers run by different supervisors and managers and supporting different projects—and in the absence of any plausible showing by Plaintiffs that a national directive existed that imposed illegal work hour and overtime policies on *all* CSRs irrespective of their individual locations.  "Simply put, this is not a case that lends itself to the sort of efficient adjudication of multiple claims by 'similarly situated' persons that § 216(b) contemplates." *Id.* at 688-89.

The following examples highlight just how individualized CSR work experiences are:

- A CSR working in Hattiesburg, Mississippi (where Plaintiff Garner worked) stated that he does not even sit down at his desk until two minutes before his shift time, and that there is

a three-minute grace period at the beginning of the shift to allow him to log in to his computer (which is already on) and his various programs—a process that takes approximately half the time allotted in the grace period.  The CSR further stated that he always takes a full 30-minute lunch break, and does not start taking phone calls until his entire 30-minute break is up.  On one occasion, this CSR forgot to log out of his phone at the end of the day, and he recalled his supervisor asked him whether additional work hours should be added so that he could be paid for the time he remained logged in to his phone.  (McNeese Decl. ¶¶ 7, 8, 9, 13, 18, 19.)

- A CSR working in Riverview, Florida stated that even though she arrives at the call center 15 minutes early, she does not begin logging in to her computer and programs until her 6:00 a.m. shift start time and she typically puts her phone into "available" mode to receive calls at approximately 6:03 a.m.  For lunch, this CSR spends 28 or 29 minutes eating and socializing with co-workers in the break room before returning to her desk, but she does not log back into her computer until the end of her 30-minute break.  At the end of the day, this CSR stated she puts her phone into "unavailable" status two minutes before her shift ends, enters her time and logs out of her programs, and then sets her computer to restart before leaving at 2:30 p.m., when her shift ends.  CSRs in the Riverview call center receive weekly emails reminding them to accurately record work hours, including any overtime. (McNear Decl. ¶¶ 6, 7, 10, 11, 12.)

- A CSR working in Bogalusa, Louisiana (where Plaintiff Vick worked) stated that on most days, she starts the log in process at 9:30 a.m.—her shift start time—and finishes logging in before the end of the three-minute grace period provided for CSRs to complete the log in process.  This CSR cannot recall a situation where she was not able to take a full 30-

minute lunch break; before going to lunch, she simply locks her computer by pressing ctrl+alt+delete, "which takes just seconds to do, if that." At the end of the shift, the CSR stated she begins logging out at 5:58 p.m. (two minutes before her shift ends) so that she can close the programs (which takes "at most 30 seconds") and enter her time before leaving. (Bearden Decl. ¶¶ 5, 7, 8, 13, 14, 15, 16.)

- A CSR working in Winchester, Kentucky (where Plaintiff Gilvin has worked) stated that he received training at the beginning of his employment with Maximus, as well as annual training, which advised employees that they are expected to:  take a full meal break even if a call runs into their scheduled break time; report any time worked during meal periods; obtain prior approval to work overtime; and to accurately record all time worked, including overtime, whether or not authorized.  Employees in Winchester are prohibited from logging into their phones any earlier than two minutes before their shift, and CSRs are "regularly reminded [they] are not required to begin logging in until shift begins."  Although he estimated that he worked into his scheduled meal period approximately 20 times in the last eight years "because [he] like[s] to talk and [his] calls tend to go long," this CSR confirmed he was paid for all of that time.  (A. White Decl. ¶¶ 5, 6, 7, 9, 12.)

- A CSR working in Lawrence, Kansas (where Plaintiff Thomas worked) stated that CSRs at that call center are expected to be logged in and ready to take their first call within three minutes of the start of their shift.  CSRs are prohibited from beginning any log-in activity earlier than five minutes before the start of their shift, and there is no expectation that they begin logging in early.  This CSR experienced technical issues "only about six times" in the last year; for any issue, she sends a message to her supervisor "so she can put an exception in [the CSR's] timesheet and [she] can receive [her] full pay for the day."  For

lunch, this CSR may put her phone into "not ready" status five to ten minutes *before* her lunch time, and takes "only one second" to lock her computer before taking her full 30-minute meal break.  At the end of the day, she typically starts logging out approximately five minutes before her shift ends, and does not wait by her computer while it restarts. (Fisher Decl. ¶¶ 7, 9, 10, 11, 12, 13, 15.)

- A CSR working in Sandy, Utah stated that she is not permitted to log in prior to her 8:00 a.m. start time, and  supervisors remind CSRs working in Sandy that policy prohibits them from performing pre-shift work.  Her entire log-in process takes less than one or two minutes; if it ever takes longer, there is no penalty if she is not on the phone at exactly 8:03 a.m. when the grace period ends.  "Major issues" with her computer "may occur once a year if that," and time spent troubleshooting technical issues is on the clock and paid.  As to her meal break, this CSR usually heads back to her desk only one or two minutes before her lunch ends and "do[es] not start taking phone calls until [her] entire 30 minutes are up." At the end of the day, she begins logging out two minutes early, and typically leaves her desk at 4:30 p.m., when her shift ends.  (Christensen Decl. ¶¶ 7, 9, 10, 11, 12, 13, 15.)

Plainly, the numerous CSR declarations demonstrate that Plaintiffs are *dissimilar* in their alleged work experience from CSRs working in Maximus call centers throughout the country.

If notice were to issue and hundreds or thousands of individuals were to opt into the case, the parties, the Court, and the jury would have no way to know whether—and why—any given member of the collective took thirty seconds, five minutes, fifteen minutes, twenty minutes, or more to log into his or her computer and programs at the beginning of his or her shift, troubleshoot technical issues, complete active calls or log off during his or her meal break, or close the programs and restart his or her computer at the end of his or her shift.  *See Meadows v. NCR Corp.*, No. 16

Civ. 6221, 2020 WL 1042042, at *6 (E.D. Ill. Mar. 4, 2020) (decertifying FLSA collective of customer engineers, noting the absence of any written or unwritten policy or practice requiring or incentivizing employees from working off-the-clock as well as considerable variation in each individual customer engineer's description of his or her reasons for working off-the-clock and nature of the alleged work). The need for individualized discovery, and individualized evidence, as to each and every member of the collective renders any collective action unmanageable.

### D.    Individualized Defenses To Liability Preclude Class-Wide Resolution.

In addition to the individualized determinations described above, how much time any CSR spent performing any of the "work" Plaintiffs allege goes directly to the question of whether Maximus must pay for the time spent performing such tasks. And "the extent of any work done off-the-clock and whether it exceeds a *de minimis* level is also not subject to resolution on a class-wide basis." *Faust v. Comcast Cable Commc'ns Mgmt., LLC*, Nos. 10 Civ. 2336 (WMN), 12 Civ. 2909 (WMN), 2014 WL 3534008, at *13 (D. Md. July 15, 2014). On the one hand, if the time for any given individual falls below ten minutes or so and thus is *de minimis*, then Maximus has no obligation to pay for the time.[29] But if, on the other hand, the time exceeds roughly ten minutes, then the *de minimis* rule may be unavailable. *See Myers v. Baltimore County*, 50 F. App'x. 583, 588 n. 6, 2002 WL 31236296, at *4 n. 6 (4th Cir. 2002) (citation omitted) ("Most courts, including the Fourth Circuit, treat daily periods of approximately 10 minutes as *de minimis*."); *Green v. Planters Nut & Chocolate Co.*, 177 F.2d 187, 188 (4th Cir. 1949) (finding it was "obvious" that the ten minute interval between the time certain employees arrived and the start time of the work day "was negligible so that the *de minimis* rule . . . should be applied," where the workers were

---

[29]    Maximus has expressly pleaded the *de minimis* rule as a defense. *See* Def.'s Answer to First Amended Complaint (ECF 34), Defense No. 3.

not required to be at their place of work before the starting time and were only expected to check in and be ready to work at the beginning of the work day) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)); *Hawkins v. E. I. du Pont De Nemours & Co.*, 192 F.2d 294, 297 (4th Cir. 1951) (recognizing potential availability of *de minimis* defense for "periods of time as long or longer than ten minutes a day"). *See also Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984) ("Most courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable.") (collecting cases).

The need to conduct individualized discovery to determine key liability issues for each member of the collective, including the applicability of the *de minimis* rule, demonstrates that the members of the putative collective are not similarly situated. There is simply no common proof whereby an individual claiming to have spent approximately 33 to 51 minutes per day (Compl. at ¶¶ 56, 68, 69, 74, 84), with Plaintiffs asserting at least one to two hours of uncompensated time per week on certain activities (Compl. ¶ 49), can plausibly represent individuals who not only spent far less time on those very same activities, but also were *on the clock and paid* while performing most of them.

Simply put, Plaintiffs' experiences are not at all similar to those of the thousands of Maximus employees across the country whom they seek to represent. Plaintiffs' motion fails for this reason. *See Meadows*, 2020 WL 1042042, at *10 (decertifying FLSA collective based on "factual complexities the evidence has revealed, the importance of the relationship between each customer engineer and his or her manager, the discretion each manager retained to award overtime work and discourage off-the-clock work, the lack of sufficient evidence of any nationwide unwritten policy or practice that might explain the numerous instances of off-the-clock work that [the plaintiff] has identified, and the absence of any meaningful explanation for how [the plaintiff]

might overcome these factual issues via efficient trial management or thoughtful sampling"); *Faust*, 2014 WL 3534008, at *13 (denying Rule 23 class certification where the evidence did not support the existence of an alleged unofficial policy capable of being demonstrated on a class-wide basis and revealed that call center employees engaged in a variety of activities between the time they logged into their computers and the time that they began taking customer calls or engaged in other tasks).

## II.   IN THE ALTERNATIVE, THE COURT SHOULD DIRECT THE PARTIES TO ENGAGE IN DISCOVERY FOCUSED ON WHETHER THE PROPOSED OPT-IN CLASS IS SIMILARLY SITUATED.

Maximus believes that on the present record, it is abundantly clear that the case law requires that Plaintiffs' motion be denied.  If, however, the Court is not prepared to deny conditional certification based on the current record, Maximus proposes that the parties engage in targeted discovery to obtain more facts regarding the extent of similarity or dissimilarity among the proposed nationwide collective.  This case presents compelling reasons to defer certification to engage in such discovery given the voluminous evidence Maximus has put forth with its opposition showing the *absence* of any unlawful and uniform company-wide policy.  Further, there is no good reason to rush this case forward toward conditional certification, which would then ensure that the parties will spend the next few years engaging in extensive discovery and motions practice, inevitably leading to a decertification motion. There is much to be gained by getting the "similarly situated" analysis right in the first instance, before notices go out to a broad group.

As an additional alternative, given the dearth of evidence presented by Plaintiffs as to any Maximus call centers other than those in which they personally worked, the Court should limit any conditional certification order to only those sites as to which Plaintiffs have presented evidence.

III.   **PLAINTIFFS' PROPOSED FORM AND MANNER OF NOTICE ARE IN MANY KEY RESPECTS INAPPROPRIATE.**

    A.   **Plaintiffs' Proposed Notice Contains Inaccurate, Misleading, And Biased Statements And Should Be Modified.[30]**

In the event that the Court elects to conditionally certify the collective class, Plaintiffs' proposed notice and consent are inappropriate in several respects.

*First*, the proposed notice is addressed to "all *hourly call-center employees* who were employed by Maximus, Inc., anywhere in the United States, at any time within the past three years though the final disposition of this matter." (ECF 29-13 (emphasis added).) The term "hourly call-center employees" is overbroad because Maximus employs hourly workers who do not answer calls and perform entirely different functions from Plaintiffs. Maximus submits that the term "hourly customer service representatives" should replace "hourly call-center employees" wherever it appears in the proposed notice and consent form.[31] *See Byard v. Verizon W. Va., Inc.*, 287 F.R.D. 365, 372-73 (N.D. W. Va. 2012) (ordering the plaintiffs to modify proper nouns used in the class definition, including "Customer Service Representative" and "Call Center Employee").

*Second*, Section 2 of the proposed notice does not adequately state Maximus' position. The notice must clearly state that Maximus: (1) denies Plaintiffs' allegations; (2) contends that the lawsuit is without merit; and (3) contends that it has properly paid Plaintiffs and all other current and former customer service representatives all wages and overtime owed under the FLSA.

---

[30]   Alternatively, to the extent the Court grants Plaintiffs' motion and conditionally certifies any collective class, Maximus requests an opportunity to meet and confer with Plaintiffs regarding the form, substance, and manner of distribution of the notice, with any unresolved issues at that point to be submitted to the Court.

[31]   Similarly, where the term "Maximus employees" appears twice in Section 7 of the proposed notice, it also should be replaced with "customer service representatives."

*Third*, Section 3 of the proposed notice should be revised to more accurately state who would be eligible to join the lawsuit.  As currently drafted, the language describing eligibility to join inappropriately encourages individuals to opt-in and inaccurately suggests that eligibility hinges on an individual's *belief* about the pay he or she received from Maximus.  This language should be modified to state that an individual is eligible to join the lawsuit if: (1) he or she was employed by Maximus, Inc. as an hourly Customer Service Representative at any point within the past three years, *and* (2) was not paid for all hours worked.

*Fourth*, the last sentence of Section 5 of the proposed notice is misleading and may dissuade individuals from choosing to file separate claims.  That sentence should be modified as follows:  "Because of the statute of limitations, eligible employees who do ***not*** join this litigation or choose to file their own separate claims ***after*** their limitations period has expired, will likely lose their rights to recover overtime for work performed in the past for Maximus."

*Fifth*, with respect to the proposed consent form, Paragraph 5 is inappropriate as it has no relevance to this lawsuit, and therefore, should be deleted.

### B.  Plaintiffs' Proposed Manner Of Distribution And Schedule Is Excessive and Should Be Modified.

Plaintiffs' proposal for the manner of distribution exceeds that which is necessary or proper.  The Court should limit the notice to one mailing via first class mail with a sixty-day notice period, and modify the proposed schedule to afford Maximus fourteen days to provide a notice list to Plaintiffs containing only the names and addresses of putative members of the collective.

Under the circumstances of this case, a 60-day opt-in period is more appropriate than the 90 days Plaintiffs seek because it will expedite the litigation, it is more consistent with cases in this and other circuits, and Plaintiffs have not demonstrated unique circumstances justifying a lengthier opt-in period.  *Lineras v. Inspiration Plumbing LLC*, No. 10 Civ. 324 (JCC), 2010 WL

4623940, at *1 (E.D. Va. Nov. 3, 2011) (60-day opt-in period); *Steinberg v. TQ Logistics, Inc.*, No. 10 Civ. 2507 (JFA), 2011 WL 1335191, at *6 (D.S.C. Apr. 7, 2011) (reducing the proposed period from 120 days to 60 days); *Byard*, 287 F.R.D. at 373 (60-day opt-in period).[32]  Further, any notice should be issued only by first class mail, and not by email, as Plaintiffs request.  It is well-established that "first class mail is the preferred method [of notice] in the unique circumstances of class certification notification." *Reab v. Elec. Arts, Inc.*, 214 F.R.D. 623, 630 (D. Colo. 2002); *accord Hinterberger v. Catholic Health Sys.*, No. 08 Civ. 380S, 2009 WL 3464134, *13 (W.D.N.Y. Oct. 21, 2009) (same).  Notice by first class mail "ensures the integrity of a judicially controlled communication directed to the intended audience." *Reab*, 214 F.R.D. at 630.

Plaintiffs' request for posting of the notice in Maximus's call centers nationwide likewise is unnecessary and excessive.  As numerous courts have recognized, "the only group that will be reached by posting are current employees, who have an interest in providing their employer with an up-to-date mailing address." *Hinterberger*, 2009 WL 3464134, at *13.  And while Plaintiffs ask the Court to authorize a reminder notice, "a reminder notice in this case is both 'unnecessary' and potentially improper."  *Byard*, 287 F.R.D. at 373; *Witteman v. Wisconsin Bell, Inc.,* No. 09 Civ. 440 (VIS), 2010 WL 446033, at *3 (W.D. Wis. Feb. 2, 2010) ("The purpose of notice is simply to inform potential class members of their rights.  Once they receive that information, it is their responsibility to act as they see fit."); *Calderon v. GEICO Gen. Ins. Co.*, No. 10 Civ. 1958

---

[32]  A lengthier opt-in period, like the 90 days proposed by Plaintiffs, typically is reserved for cases where there is a legitimate explanation to support the length of the period, such as if the potential class is transitory or there is a high turnover rate. *See, e.g.*, *Anyere v. Wells Fargo, Co., Inc.*, No. 09 Civ. 2769, 2010 WL 1542180, at *4 (N.D. Ill. Apr. 12, 2010) (transitory class and high turnover rate); *Martinez v. Cargill Meat Solutions*, 265 F.R.D. 490, 501 (D. Neb. 2009) (reducing proposed 120-day period to 45-day period and noting that "[t]here is no evidence the putative plaintiffs are a transient population, or that due to vocation, they may not timely receive their mail.").  Plaintiffs have offered no explanation or evidence supporting a longer period.

(RWT), 2011 WL 98197, at *3 (D. Md. Jan. 12, 2011) (reminders have a tendency to stir up litigation). The court-approved initial notice should be the only communication from Plaintiffs' counsel to potential opt-ins.

Lastly, the Court should enlarge the schedule proposed by Plaintiffs to allow Maximus fourteen days to provide a notice list to Plaintiffs.

## CONCLUSION

For these reasons, Plaintiffs' motion for conditional certification should be denied.

Respectfully submitted,

By: */s/ Paul DeCamp*

ADRIANA S. KOSOVYCH
   (admitted *pro hac vice*)
EPSTEIN, BECKER & GREEN, P.C.
875 Third Avenue
New York, New York 10022
Tel:  212-351-4500
Fax: 212-878-8600
AKosovych@ebglaw.com

PAUL DECAMP (VA Bar No. 76204)
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C.  20037
Tel:  202-861-0900
Fax: 202-296-2882
PDeCamp@ebglaw.com

AMARDEEP K. BHARJ
   (admitted *pro hac vice*)
EPSTEIN, BECKER & GREEN, P.C.
227 W. Monroe Street, Suite 3250
Chicago, IL 60606
Tel:  312 599-1400
Fax: 312-845-1998
ABharj@ebglaw.com

*Counsel for Defendant*

November 24, 2021